EMN:AH/DAL/PT/KDE/BDM
F.#2015R01873

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against -

ROGER HUGUET,

         Defendant.

- - - - - - - - - - - - - - - - - -X

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ **NOV 1 7 2015** ★

BROOKLYN OFFICE

I N F O R M A T I O N

Cr. No. 15-585 (RJD)
(T. 18, U.S.C., §§
981(a)(1)(C), 982(a)(1),
982(b), 1349, 1956(h)
and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

THE UNITED STATES ATTORNEY CHARGES:

## INTRODUCTION TO ALL COUNTS

        At all times relevant to this Information, unless otherwise indicated:

I.   Background

     A.   FIFA

        1.   The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football.  FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA comprised as many as 209 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.  The United States first

became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following in the 1990s. At various times, FIFA maintained offices both in Zurich and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

2.    Each of FIFA's member associations also was a member of one of six continental confederations recognized by FIFA: the Confederation of North, Central American, and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC"). Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations. Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

3.    FIFA was governed by: a congress composed of its member associations, which acted as the association's highest legislative body; an executive committee, which acted as the

executive body; and a general secretariat, which acted as the administrative body.  FIFA also had a president, who represented the association worldwide and was responsible for the implementation of decisions.  FIFA also operated several standing committees whose members included soccer officials from various national member associations.

4.    Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

5.    FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and creating and enforcing rules that govern the confederations and member associations.  FIFA helped finance the confederations and their member associations, including by providing funds through the Financial Assistance Program and the Goal Program.

6.    FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006, again in 2009, and most recently in 2012 (generally, the "code of ethics").  The

3

code of ethics governed the conduct of soccer "officials," which expressly included, among others, various individuals with responsibilities within FIFA, the confederations, member associations, leagues and clubs.  Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain.  The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty.  By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues, and clubs.

7.    Among other tournaments, FIFA organized the World Cup, the sport's premier event, a quadrennial international tournament involving the senior national men's teams of 32 nations.

B.    CONCACAF

8.    CONCACAF was a continental soccer confederation incorporated, since 1994, as a non-profit corporation in Nassau, Bahamas.  CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America,

4

the Caribbean, and three South American countries. The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF. From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business.

9. Like FIFA, CONCACAF was governed by its own congress, general secretariat, executive committee, and standing committees.

10. Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based. CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. Among other tournaments, CONCACAF organized the Gold Cup, featuring the men's national teams from CONCACAF and, from time to time, other confederations, as well as a tournament featuring the top men's professional league - or club - teams. In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

11. CONCACAF also organized World Cup qualifier matches, using a variety of formats, and, from time to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA.

C.   The Regional Federations and National Associations

12. In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

13. For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF"), and the North American Football Union ("NAFU").  The United States Soccer Federation was thus a member association of CONCACAF as well as NAFU, while Puerto Rico and the United States Virgin Islands were both members of CONCACAF and CFU.

14. The national associations, also often referred to as "federations," worked together to organize exhibition soccer matches between national teams, known as "friendlies," which also took place on the club level.

D.   The Sports Marketing Companies

15. FIFA, the continental confederations, the regional federations and the national member associations often

6

entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies, and other events, as well as other rights associated with the sport.  These sports marketing companies, including multinational corporations with headquarters, offices, or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights, and ticketing rights.  These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors, and sub-licensees, including those located in the United States.

16.  The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for FIFA and its constituent organizations, as well as for the sports marketing companies.  The United States was an increasingly important and lucrative market for the commercialization of these rights.

17.  The Traffic Group was a multinational sports marketing company based in São Paulo, Brazil.  The Traffic Group

7

was comprised of, among other entities, Traffic Assessoria e
Comunicações S/C Ltda. ("Traffic Brazil"), Traffic Sports
International, Inc. ("Traffic International"), Traffic Sports
USA, Inc., Traffic Sports Europe B.V., and Continental Sports
International, Inc. (referred to collectively herein as
"Traffic" or the "Traffic Group").  Beginning in or about 1990,
Traffic expanded its operations into the United States,
partnering with and later acquiring a Florida company called
Inter/Forever Sports, Inc., which was renamed Traffic Sports
USA, Inc. (collectively referred to below as "Traffic USA") in
or about 2003.

> 18.  Sports Marketing Company A was a sports marketing
company based in Miami, Florida.  Sports Marketing Company A was
a subsidiary of Media Company A, which engaged in a variety of
media activities primarily in the United States and Latin
America, including television production and the
commercialization of sports marketing rights.  Media Company A,
which was also based in Miami, Florida, was affiliated with
Media Company B, a multinational media conglomerate based in
Europe.  The identities of Sports Marketing Company A, Media
Company A, and Media Company B are known to the United States
Attorney.

II.  The Defendant

19.  The defendant ROGER HUGUET was a citizen of Spain, and beginning in or about 2007, a naturalized citizen of the United States and resident of Florida.  In or about and between 2008 and the present, HUGUET was the chief executive officer of Sports Marketing Company A and Media Company A.

III.  The Defendant's Co-Conspirators

20.  The identities of the following individuals are known to the United States Attorney:

21.  At various times relevant to this Information, Co-Conspirator #1 was self-employed, including as a consultant in the field of soccer and media marketing rights.  At other times relevant to this Information, Co-Conspirator #1 was an executive of Sports Marketing Company A.

22.  At various times relevant to this Information, Co-Conspirator #2 was a consultant in the area of negotiating soccer media and marketing rights, principally with certain CONCACAF member associations.

23.  At various times relevant to this Information, Co-Conspirator #3 was a consultant in the area of negotiating soccer media and marketing rights, principally with certain CONCACAF member associations.

24. At various times relevant to this Information, Co-Conspirator #4 was a high-ranking executive and shareholder of Media Company B.

25. At various times relevant to this Information, Co-Conspirator #5 was a high-ranking official of FIFA, CONCACAF, CFU, and one of FIFA's national member associations.

IV. The Fraudulent Schemes

26. Beginning in or about 2008, the defendant ROGER HUGUET, together with others, participated in a series of bribery schemes in order to obtain media and marketing rights to soccer matches from certain CONCACAF member associations. The defendant and his co-conspirators planned the schemes in the United States, among other locations, and used the wires of the United States to carry out the schemes, including by paying bribes from accounts at financial institutions in the United States. As part of these schemes, HUGUET and his co-conspirators over time agreed to pay millions of dollars of bribes to high-ranking officials of several of CONCACAF's member associations.

10

A.   UNCAF Region World Cup Qualifiers Scheme

27.   Since at least in or about 1998, the media
rights to matches played to qualify for the World Cup have been
owned by the team designated as the "home team" for each
qualifier match.   UNCAF's member associations sought to generate
revenue by, among other things, selling the media rights they
owned to their home World Cup qualifier matches.   Each of the
UNCAF member nations negotiated separately with prospective
purchasers of the rights, which included Sports Marketing
Company A.   UNCAF member associations included UNCAF Federation
A, UNCAF Federation B, UNCAF Federation C, and UNCAF Federation
D, the identities of which are known to the United States
Attorney.

28.   In or about 2008, Co-Conspirator #2 was engaged
as an agent of UNCAF Federation C, and was primarily based in
South Florida.   In his capacity as an agent of UNCAF Federation
C, Co-Conspirator #2 entered into negotiations with the
defendant ROGER HUGUET, acting on behalf of Sports Marketing
Company A, over Sports Marketing Company A's purchase of the
media and marketing rights to UNCAF Federation C's 2014 World
Cup qualifiers.   In order to obtain those rights for Sports
Marketing Company A, HUGUET agreed to pay a fee to Co-

11

Conspirator #2, knowing that a portion of the funds paid to Co-Conspirator #2 would be used to pay bribes to high-ranking officials of UNCAF Federation C.

29.  In or about 2009, Co-Conspirator #1 and Co-Conspirator #3, both of whom were based in South Florida, were engaged as paid consultants to Sports Marketing Company A, and in that capacity they agreed to help Sports Marketing Company A obtain media and marketing rights from certain CONCACAF member associations.  Co-Conspirator #1 and Co-Conspirator #3 thereafter negotiated contracts with UNCAF Federation A and UNCAF Federation B to purchase media and marketing rights to those federations' 2014 World Cup qualifiers.  In order to obtain those rights, in or about and between 2009 and 2011, the defendant ROGER HUGUET, Co-Conspirator #1, and Co-Conspirator #3 agreed to pay, and did pay, bribes to high-ranking officials of UNCAF Federation A and UNCAF Federation B.

30.  In or about 2011, the defendant ROGER HUGUET hired Co-Conspirator #1 to work as an executive at Sports Marketing Company A in Miami.  Among other things, Co-Conspirator #1 was tasked with negotiating and obtaining for Sports Marketing Company A contracts for media and marketing

12

rights held by CONCACAF member associations, including those of UNCAF.

31. Thereafter, in or about and between 2011 and 2015, the defendant ROGER HUGUET, Co-Conspirator #1, and Co-Conspirator #2, together with others, caused Sports Marketing Company A to enter into contracts with UNCAF Federation A, UNCAF Federation B, and UNCAF Federation C to obtain media and marketing rights to these federations' 2018 and/or 2022 World Cup qualifiers. In order to obtain those contracts, HUGUET, together with others, agreed to pay, and did pay, bribes to high-ranking officials of the three UNCAF federations.

32. In or about the spring of 2012, Sports Marketing Company A and Traffic USA, which until that time had been competitors, agreed to pool their resources and share revenue earned from the purchase of rights to World Cup qualifier matches played by CONCACAF member associations.

33. Traffic USA owned the rights to the qualifier matches hosted by UNCAF Federation D in connection with the 2014 and 2018 World Cups. In or about 2014, the defendant ROGER HUGUET learned that, rather than renewing its contract with Traffic USA, UNCAF Federation D was contemplating selling the

13

rights to its World Cup 2022 qualifier matches to another company.

34. The defendant ROGER HUGUET, Co-Conspirator #1, and Co-Conspirator #2 thereafter agreed to pay, and did pay, a bribe to a high-ranking official of UNCAF Federation D in order to cause that federation to renew its contract with Traffic USA, which, as noted, had a revenue-sharing agreement with Sports Marketing Company A.

35. Payments in furtherance of this scheme were made by wire transfer from bank accounts in the United States to bank accounts outside the United States. Moreover, the conspirators used fictitious contracts and invoices, among other methods and means, in order to conceal the true nature and purpose of bribe payments made in furtherance of the scheme.

36. On various occasions in or about and between 2008 and 2015, the defendant ROGER HUGUET informed Co-Conspirator #4, who was based in Europe, of the bribes paid on behalf of Sports Marketing Company A to high-ranking officials of UNCAF federations in order to secure the rights to those federations' World Cup qualifier matches. Among other things, HUGUET told Co-Conspirator #4 that fictitious contracts had been used in order to conceal the true nature and purpose of bribe payments

14

made in furtherance of the scheme. Co-Conspirator #4 approved of this course of conduct.

B.   CFU World Cup Qualifiers Scheme

37.   Like UNCAF, CFU was a regional federation within CONCACAF. CFU's members included soccer federations of the Caribbean nations and territories, including those of Puerto Rico and the United States Virgin Islands. Like UNCAF member associations, CFU member associations sought to generate revenue by, among other things, selling the media rights they owned to their home World Cup qualifier matches. Unlike UNCAF member associations, however, CFU member associations often negotiated as a group with prospective purchasers of the rights, including Sports Marketing Company A.

38.   As stated above, in or about March 2012, Sports Marketing Company A and Traffic USA agreed to pool their resources and share revenue earned from the purchase of rights to World Cup qualifier matches played by CONCACAF member associations. This agreement covered the media and marketing rights to CFU's 2018 and 2022 World Cup qualifier matches.

39.   Sometime after the defendant ROGER HUGUET learned that a revenue sharing agreement had been reached between Sports Marketing Company A and Traffic USA, Co-Conspirator #4 informed

15

HUGUET that Co-Conspirator #4, on behalf of Sports Marketing Company A, had agreed with a representative of Traffic USA to pay half of a $3 million bribe payment to Co-Conspirator #5, a high-ranking CONCACAF official, in connection with Traffic USA's acquisition of the 2018/2022 CFU World Cup qualifier rights.

40.   Co-Conspirator #4 directed the defendant ROGER HUGUET to facilitate the payment of the bribe to Co-Conspirator #5, and HUGUET agreed.  HUGUET, together with Co-Conspirator #2, thereafter caused a series of payments to be made that together made up a portion of Sports Marketing Company A's half of the $3 million bribe.  In the course of causing these payments to be made, HUGUET met with at least one additional co-conspirator on more than one occasion in South Florida.

41.   The conspirators made payments in furtherance of this scheme by wire transfer from bank accounts in the United States to bank accounts outside the United States.  Moreover, the conspirators used fictitious contracts and invoices, among other methods and means, in order to disguise the true nature and purpose of bribe payments made in furtherance of the scheme.

* * * *

42.   No disclosure of the foregoing bribery schemes was made to FIFA, CONCACAF, or CFU, including without limitation

16

to their respective executive committees, congresses, or
constituent organizations.

COUNT ONE
(Wire Fraud Conspiracy –
UNCAF Region World Cup Qualifiers Scheme)

43.   The allegations contained in paragraphs 1
through 42 are realleged and incorporated as if fully set forth
in this paragraph.

44.   In or about and between 2008 and 2015, both
dates being approximate and inclusive, within the Southern
District of Florida, the defendant ROGER HUGUET, together with
others, did knowingly and intentionally conspire to devise a
scheme and artifice to defraud FIFA, CONCACAF, and national
member associations and their constituent organizations,
including to deprive FIFA, CONCACAF, and national member
associations and their constituent organizations of their
respective rights to honest and faithful services through bribes
and kickbacks, and to obtain money and property by means of
materially false and fraudulent pretenses, representations, and
promises, and for the purpose of executing such scheme and
artifice, to transmit and cause to be transmitted by means of
wire communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds, to wit: wire transfers,

17

telephone calls, and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT TWO
(Wire Fraud Conspiracy – CFU World Cup Qualifiers Scheme)

45.    The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

46.    In or about and between 2012 and 2015, both dates being approximate and inclusive, within the Southern District of Florida, the defendant ROGER HUGUET, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONCACAF, and CFU and their constituent organizations, including to deprive FIFA, CONCACAF, and CFU and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers,

18

telephone calls, and emails, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT THREE
(Money Laundering Conspiracy –
CFU World Cup Qualifiers Scheme)

47. The allegations contained in paragraphs 1 through 42 are realleged and incorporated as if fully set forth in this paragraph.

48. In or about and between 2012 and 2015, both dates being approximate and inclusive, within the Southern District of Florida, the defendant ROGER HUGUET, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United

19

States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

49. The United States hereby gives notice to the defendant that, upon his conviction of the offenses charged in Counts One and Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of such offenses.

50. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

20

(d) has been substantially diminished in value;
or

(e) has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNT THREE

51. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any and all property, real or personal, involved in such offense, or any property traceable to such offense.

52. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

21

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p))

ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

22